**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NATASHA BOOKER, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:22-CV-01028 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| JULIE SU, Acting Secretary, U.S. | ) | |
| Department of Labor, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Natasha Booker worked for the Department of Labor's Office of Federal Contract Compliance Programs, but now she alleges that the Department subjected her to race and disability discrimination, interference with reasonable accommodation, and retaliation, in violation of Section 504 of the Rehabilitation Act and Title VII of the Civil Rights Act. R. 1, Compl.[1] The Department moves for summary judgment, asserting that Booker has not established that she experienced an adverse employment action or that the Department acted with discriminatory intent. R. 26, 43, Def.'s Mots. For the reasons discussed in this Opinion, the motion for summary judgment is granted in part and denied in part.[2]

---

[1]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number. Under Civil Rule 25(d), the current Acting Secretary of Labor, Julie Su, is substituted for the former Secretary as the named defendant.

[2]Because this action was brought under Title VII and the Rehabilitation Act, this Court has subject matter jurisdiction over the case under 28 U.S.C. § 1331.

## I. Background

In deciding Natasha Booker's motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### A. Local Rule 56.1

Before addressing the merits of the Department's summary judgment motion, a word or two is needed on Booker's Rule 56.1 Statement of Facts. Northern District of Illinois Local Rule 56.1(b) requires a party opposing a summary judgment motion to (among other things) respond to the moving party's Statement of Facts. Local R. 56.1(b)(2)–(3). If there is a dispute over an asserted fact, then the non-movant's response must refer to specific parts of the record. Local R. 56.1(b)(3)(B). The non-movant may also provide a statement of any additional facts that require the denial of summary judgment, again with supporting references to the record. Local R. 56.1(b)(3)(C).

In support of each submission, the non-movant must "identify[] specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Indiana Univ.*, 870 F.3d 562, 568 (7th Cir. 2017). The non-moving party need not necessarily go as far as deposing its own witnesses, but it must go beyond the pleadings and produce, for example, affidavits or answers to interrogatories. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (citing Fed. R. Civ. P. 56(c)). But to withstand summary judgment, such an affidavit must "provide sufficient

evidence to allow a trier of fact" to find for the non-moving party. *Whitaker v. Wisconsin Dep't of Health Servs.*, 849 F.3d 681, 685 (7th Cir. 2017).

The Department seeks to disqualify several of Booker's factual assertions because the assertions are (to the Department's way of thinking) "conclusory and lack a foundation of personal knowledge," and are thus inadmissible. R. 43, Def's Reply at 3. The Department is correct that some of the assertions in Booker's response to the Rule 56.1 Statement, Local R. 56.1(b)(2), and some in her own statement of additional facts, Local R. 56.1(b)(3)(C), offer mere conclusions about the state of mind of decisionmakers. R. 39, Pl.'s Resp. DSOF ¶¶ 4–5, 9, 12, 14–15, 17–24, 29–30, 33–37, 39–45, 47, 49–61, 63; R. 39 PSOF ¶¶ 8, 10, 11, 25, 26, 29, 32, 35–39. The portions of those paragraphs are inadmissible to the extent that they lack a foundation of personal knowledge. *See Smith v. Illinois Dep't of Transp.*, 936 F.3d 554, 559 (7th Cir. 2019) (citing Fed. R. Civ. P. 56(c)(4)) (requiring that affidavits used to support or oppose a summary judgment motion be based on personal knowledge). But the paragraphs are not inadmissible merely because they are supported by Booker's affidavit, which was prepared in support of her summary judgment response. *See* Fed R. Civ. P. 56(c)(1)(A) (stating that affidavits "including those made for purposes of the motion only" can be used to dispute a material fact in a summary judgment motion). It is well understood in this circuit that "'[s]elf-serving affidavits can indeed be a legitimate method of introducing facts on summary judgment," so long as the affidavit is otherwise admissible. *Widmar v. Sun Chemical Corp.*, 772 F.3d 457, 459–60 (7th Cir.

3

2014). To the extent that evidence referred to in the Rule 56.1 Statement is admissible, the Opinion describes and cites it below.

## B. Undisputed Facts

The Department of Labor's Office of Federal Contract Compliance Programs monitors federal contractors' and subcontractors' compliance with federal non-discrimination laws. R. 28, DSOF ¶ 3; R. 29-15, Brinson Decl. ¶ 3. Natasha Booker, an African-American woman, worked as a program analyst in the Department's Planning and Support Division from 2005 until she resigned and started a new job in 2020. Compl. ¶ 4; DSOF ¶¶ 2, 4; R. 29-1, Booker Dep. at 9–10. Her duties included creating "annual program plans, program trend analysis, case management evaluation, quality assurance, outreach, statistical case analysis, procurement and acquisition, labor and employee management, region-wide training and development, recruitment and placements and other administrative analysis." R. 29-2, DSOF Exh. 2 at 4.

Booker also held a position as an Equal Employment Opportunity (EEO) counselor, which was not included in the program analyst job description but took up about 20% of her time. DSOF ¶ 4; R. 29-9, DSOF Exh. 9 ¶¶ 104–6. At least once during her tenure as an EEO counselor, Booker received complaints against one of her supervisors, Carmen Navarro, from other employees and counseled the employees through their complaints. Compl. ¶ 15; DSOF ¶ 9; Booker Dep. at 92.

The Department's program analysts were required to work during "core hours," which were Tuesdays and Thursdays between 10:00 a.m. and 2:00 p.m. DSOF ¶ 19; Brinson Decl. ¶ 5. Otherwise, analysts had the flexibility to set their own daily

4

work hours. *Id.* That flexibility permitted analysts to telework two days per week and to work more (or fewer) than eight hours on a given day if they first verbally informed their supervisor. DSOF ¶¶ 18–20; Brinson Decl. ¶¶ 4–6. Employees were allotted one Alternative Work Schedule day (which the parties call an "AWS" day)—an option of a paid day off if they completed 80 hours of work during the pay period—every two weeks. DSOF ¶ 22; Brinson Decl. ¶ 7. If an analyst worked more than 80 hours during a pay period, then they could carry over the additional hours as a "credit" to their hours worked during the following pay period. DSOF ¶ 23; Brinson Decl. ¶ 8. Booker's telework days were Tuesdays and Thursdays. DSOF ¶ 18; Brinson Decl. ¶ 7; R. 29-24, DSOF Exh. 24 at 1.

In 2018, Booker was diagnosed with fibromyalgia, muscular tightness, muscular spasms, and pain. DSOF ¶ 10; Booker Dep. at 32. She claims that her disabilities caused her to have a low energy level, pain, muscle tightness, and an inability to walk, stand, or sit for long periods. DSOF ¶ 10; Booker Dep. at 64–66; R. 29-4, DOSF Exh. 4. To treat her symptoms, Booker received massages, chiropractic adjustments, and stretch therapy, including Pilates sessions a few times per week. Booker Dep. at 34–36, 40, 57–59.

To help carve out time to receive her treatments, on August 1, 2019, Booker submitted a reasonable accommodation request to the Civil Rights Center (an internal part of the Department) requesting reduced work hours. DSOF ¶ 25; DSOF Exh. 4. Booker specifically asked for time away from work to attend her "physical therapy

5

activities during the late mornings and or early afternoons 3 times during the work week" and to permit a late start on days that she experienced flare ups. *Id.*

### C. Civil Rights Center Complaint

Booker believes that she began receiving differential, negative treatment from her supervisors, Henrietta Brinson and Carmen Navarro, shortly after Booker submitted the reasonable-accommodation request. This eventually caused her to file a formal complaint with the Civil Rights Center alleging that her supervisors subjected her to unlawful discrimination. DSOF ¶ 7; R. 29-3, DSOF Exh. 3. The Center accepted, for consideration, 16 alleged incidents from Booker's complaint that constituted unlawful discrimination. DSOF Exh. 3 at 1–3. For the reader's reference, the claims are listed in their entirety below (along with the Center's prefatory description), and the underlying facts are explained in more detail later in this Opinion.

Whether the Office of Federal Contract Compliance Programs (OFCCP) subjected Complainant to unlawful disparate treatment and/or a hostile work environment from on or around July 1, 2019 and ongoing, based on her race (black), sex (female), disability (Fibromyalgia), parental status, and/or in reprisal for prior protected activity when:

1. On or around August 13, 2019, the Director [Brinson] and the Deputy Regional Director [Navarro] disregarded [Booker]'s approved reasonable accommodation when on short notice, they directed [Booker] to travel to all eight (8) district offices during August 19–23, 2019, September 9–13, 2019 and September 16–20, 2019, to conduct unscheduled reviews of the Records Management Program;

2. On August 8, 13 and 21, 2019 and September 10, 2019, [Brinson] denied [Booker]'s multiple requests for a reasonable accommodation in the form of minimizing [Booker]'s travel requirements;

3. On August 28, 2019, [Brinson] denied [Booker]'s request to telework to attend a medical appointment;

4. On December 17, 2019, [Brinson] informed [Booker] that [Booker] was no longer able to telework on [Booker]'s [Alternative Work Schedule] day off/telework;

5. On December 19. 2019, [Brinson] sent an email to the Planning and Support staff assigning Standard Operating Procedure and training as a means of employees;

6. On January 22, 2020, [Brinson]: (a) failed to provide [Booker] with feedback on [Booker]'s reviews of the Record Management Program and admitted to not having received or reviewed the Record Management Reports [Booker] submitted on October 2019; (b) denied [Booker]'s request to work on operational assignments; (c) verbally informed [Booker] that there were tentative plans to have [her] travel to all eight (8) regional offices again in 2020;

7. In or around January 2020, [Brinson] required [Booker] to call in everyday that [she] worked over 8 hours;

8. On February 10, 2020, [Booker] was forced to conduct [her] quarterly meeting the Records Management staff without management feedback of [Booker]'s August/September 2019 onsite reviews;

9. On February 17, 2020, [Brinson] denied [Booker]'s February 13, 2020 request to utilize sick leave while on approved FMLA from February 11–14, 2020;

10. On February 18, 2020, [Brinson] sent an email threatening to mark Booker AWOL while [she] was on approved FMLA no February 11, 2019;

11. On June 8, 2020, [Booker] was denied an assignment as an EEO Counselor;

12. From July 1, 2019 to the present, grade sustaining work has been removed from [Booker]'s position in that more than half of the duties in her position description as a Program Analyst have been removed/are no longer available and have not been replaced with grade sustaining (GS-13) duties;

13. From October 2018 through January 2020, [Booker] has made multiple requests to perform operation/grade sustaining (GS-13) work and various

management officials have denied these requests on various dates (including, but not limited to July 15, 2019 and January 22, 2020);

14. On July 16, 2019, [Brinson] sent [Booker] an e-mail in which [Brinson] alleged a performance deficiency on [Booker]'s part (not receiving an SOP from [Booker]) that had not been previously assigned, required, or identified as a performance deficiency;

15. On various dates from October 2018 to January 2020, unspecified management officials interfered with [Booker]'s "EEO Counselor and FEB Mediatory" work in unspecified ways, such that [Booker] has been required to use leave in order to perform FEB Mediator duties, even though similarly situated colleagues have no had to do so; and

16. On or around November 5, 2020, [Booker] felt compelled to resign from her positions as a result of the hostile work environment and conduct of [Booker]'s supervisors (Constructive Discharge).

DSOF ¶ 7; DSOF Exh. 3 at 1–2.

In November 2021, the Center issued a Final Agency Decision based on its Report of Investigation, finding that Booker failed to establish that she was denied a reasonable accommodation, subjected to unlawful disparate treatment, or subjected to a hostile work environment. DSOF Exh. 3 at 3.

A few months later, in February 2022, she filed this action against the Department of Labor alleging failure to accommodate, interference, and retaliation in violation of the Rehabilitation Act, 29 U.S.C. § 791, and race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 32 U.S.C. § 2000e *et seq*. Compl. ¶ 1. Booker later withdrew the accommodation claim. R. 38, Pl.'s Resp. at 2. The Department now seeks summary judgment against the remaining claims, contending that the record does not show that the Department discriminated or

8

retaliated against Booker, nor did it interfere with her right to access her reasonable accommodation. R. 27, Def.'s Br. at 1.

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp.*, 477 U.S. at 323; *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then

"set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

## III. Analysis

### A. Title VII Discrimination

Booker claims that the Department violated Title VII by discriminating against her on the basis of her race. *See* 42 U.S.C. § 2000e-2(a)(1). The parties primarily rely on the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to assess whether Booker has enough evidence of race discrimination. To survive a summary judgment challenge under that test, Booker first must meet the four elements of a prima facie case of discrimination. *Id.* at 803. If she passes this initial step, then the burden then shifts to the Department to offer a legitimate, nondiscriminatory reason for its actions. *See Smith v. Chicago Transit Auth.*, 806 F.3d 900, 905 (7th Cir. 2015). If the Department can do so, then Booker must show that the given reason is pretextual, that is, a cover-up for race discrimination. *McDonnell Douglas*, 411 U.S. at 804. The whole of the evidence must permit a reasonable jury to find that she suffered an adverse employment action because of her race. *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765–66 (7th Cir. 2016).[3] Here, even with the benefit of reasonable inferences and even viewing the evidence in Booker's favor,

---

[3]The Seventh Circuit did away with sorting evidence into "direct" and "indirect" piles when working through the *McDonnell Douglas* framework. *See Ortiz*, 834 F.3d at 765 ("Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the "direct" evidence does so, or the "indirect" evidence. Evidence is evidence."). This Opinion likewise considers the direct and circumstantial evidence together.

no reasonable jury Booker can find that the Department subjected her to an adverse employment action based on her race.

### 1. Prima Facie Case

To establish a prima facie case of discrimination under the *McDonnell Douglas* framework, Booker must provide evidence showing that: (1) she belongs to a protected class; (2) she met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) another similarly situated employee outside of her protected class received better treatment from her employer. *See Smith*, 806 F.3d at 905. The parties do not dispute the first and second elements. Booker is an African-American woman, so she is member of a protected class. DSOF ¶ 4; Pl.'s Resp. at 9. The Department also concedes that Booker mostly performed satisfactorily—or at least none of the alleged adverse treatment was imposed for inadequate performance. DSOF ¶ 40; DSOF Exh. 7 ¶ 159.

The parties devote substantial pages of their briefs to disputing the third element—whether Booker experienced a materially adverse employment action. An adverse employment action is material where the plaintiff suffers "a significant change in employment status." *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016) (cleaned up).[4] Adverse employment actions generally fall into three categories: (1) termination or reduction in "compensation, fringe benefits, or other financial terms of employment";

---

[4] This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

(2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce further career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge. *Alamo v. Bliss*, 864 F.3d 541, 552 (7th Cir. 2017) (cleaned up). But "not everything that makes an employee unhappy is an actionable adverse action." *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996).

For her part, Booker contends that she was discriminated against when Brinson and Navarro removed Booker's "grade-sustaining" work ("grade" as in job grade) and when Brinson sent Booker an email on Booker's poor performance on July 16, 2019. Pl.'s Resp. at 6. More specifically, Booker offers evidence to support each of the following claims (organized by reference to the claim number assigned by the Civil Rights Center):

- **Claim 3, Telework.** On August 28, 2019—a Wednesday—Booker requested to telework so she could attend a medical appointment. Pl.'s Resp. DSOF ¶ 36; R. 39-1, Booker Decl. ¶¶ 24–25.

- **Claim 4, AWS Telework.** In December 2019, Booker emailed Brinson requesting to work for four to five hours on what Booker called her "telework/AWS Friday." Pl.'s Resp. DSOF ¶ 37; R. 29-16 DSOF Exh. 16.

- **Claims 5 and 14, SOP Assignment.** In July 2019, Brinson emailed Booker expressing concern about a pending assignment to write standard operating procedures for Booker's functional area. Booker replied that she had never received the assignment. Pl.'s Resp. DSOF ¶ 39; R. 29-22, DSOF Exh. 22.

- **Claims 6(a) and 8, No Feedback.** Booker alleges that Brinson did not go over Booker's records management report or on-site accountability reviews with Booker. Pl.'s Resp. DSOF ¶¶ 40, 44; R. 29-10, DSOF Exh. 10 at 90–91 (PDF page number).

12

- **Claims 6(b), 6(c), 12, and 13, Work Complaints.** Booker claimed that certain job responsibilities were taken away, including conducting quality audits and training. She alleges that she requested more "meaningful" operational assignments but did not receive any. Booker also alleges that Aldridge did not have similar job responsibilities taken away. Pl.'s Resp. DSOF ¶¶ 41, 50, 13; DSOF Exh. 10 at 117–18, 122 (PDF page number).

- **Claim 7, Call-in.** Booker complained that Brinson required her to call in if she worked more than eight hours. Pl.'s Resp. DSOF ¶ 43; DSOF Exh. 10 at 83–84 (PDF page number).

- **Claim 11, Denial of EEO Counselor Assignment.** After Booker filed her EEO complaint, Navarro declined to permit Booker's continued participation as an EEO counselor. PSOF ¶ 37; Booker Decl. ¶ 63.

In Booker's view, evidence of these incidents would permit a reasonable jury to find that the Department treated her in a materially adverse manner. *See* Pl.'s Resp. at 4–7.

The Department contends that most of Booker's claims do not constitute "materially" adverse employment actions. Def.'s Br. at 11. Even when viewed in the light most favorable to Booker, the Department is right. The experiences to which Booker points—however frustrating they might have been—do not rise to the level of establishing materially adverse employment actions. First, simply receiving the assignment to write standard operating procedures, and then receiving a reminder that the assignment was due, is not an adverse employment action, even if unfair or burdensome. *See Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004) (holding that the assignment of an excessive workload generally does not constitute an adverse employment action). Nor do the removal of certain job assignments qualify, where Booker offers no admissible evidence that the removal stifled promotional or other opportunities.

13

Neither is receiving negative performance reviews, without some resulting tangible harm. *See Grube v. Lau Indus. Inc.*, 257 F.3d 723, 729 (7th Cir. 2001) (holding that negative performance reviews without tangible job consequences are not adverse employment actions). The other requirements, such as notice of time off or work-hours flexibility, similarly do not amount to material changes in employment. Even when viewed through the summary judgment lens favoring Booker, the third element of the prima facie case has not been met.

The parties also dispute whether Booker offers enough evidence on the fourth element of the *McDonnell Douglas* test, that is, whether there was a similarly situated employee who received better treatment. Here again the evidence falls short. Booker proffers Kent Aldridge as a program analyst who does not share Booker's protected characteristics; he is a white male and did not receive a disability accommodation. PSOF ¶ 26; R. 39-1, Booker Decl. ¶ 38; R. 39-4, PSOF Exh. 4. Booker argues that Aldridge received preferential treatment because he was permitted to telework on his Alternative Work Schedule (AWS) day, and he was not reprimanded for turning in his SOP assignment late. Pl.'s Resp. at 8. In response, the Department explained that Aldridge's AWS day fell on one of his telework days, which allowed him to telework as an AWS day if he chose to work at all. R. 44, Def.'s Resp. PSOF ¶ 26; R. 44-2, Def.'s Resp. PSOF Exh. 27. Booker has no evidence to the contrary. In this way, then, Booker and Aldridge are not similarly situated, and he is not an adequate comparator. *See Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012) (explaining that employees who are not subjected to the same standards are not similarly situated).

14

## 2. Legitimate, Non-discriminatory Explanation

Even if Booker had set forth a prima facie case, the Department offers legitimate, nondiscriminatory reasons to explain each of its employment actions. The Department's responsive evidence consists of (as a reminder, the numbering arises from the Civil Rights Center's assignment of numbers):

- **Claims 3 and 4.** The Department presented evidence that Brinson denied Booker's telework requests because Booker asked to telework on days that she had already agreed to work in person, including on her Alternative Work Schedule day. DSOF ¶¶ 36, 37; R. 29-7, DSOF Exh. 7 ¶¶ 66, 67, 87; DSOF Exh. 16; R. 29-25, DSOF Exh. 25.

- **Claims 5 and 14.** The Department offered evidence that all staff members were required to complete the standard-operating-procedures assignment, and all staff members received the corresponding check-in email, regardless of whether they had completed the assignment at that time. DSOF ¶¶ 38, 57; R. 29-20, DSOF Exh. 20; R. 29-21, DSOF Exh. 21.

- **Claims 6(a) and 8.** The Department offered evidence that it was not Brinson's practice to go over completed reports with staff each time they completed an assignment. DSOF ¶¶ 40, 44; DSOF Exh. 7 ¶¶ 124–26, 159–60.

- **Claims 6(b), 6(c), 12, and 13**. The Department offered evidence that Brinson was not responsible for assigning the kind of work that Booker requested, that other staff might handle Booker's typical assignments from time to time, and that, although additional travel for Booker was considered, it did not actually happen. DSOF ¶¶ 41–42, 50–51, 54; Brinson Decl. ¶ 3; R. 29-8, DSOF Exh. 8 ¶¶ 348–51; DSOF Exh. 7¶¶ 230–32, 246; DSOF Exh. 9 ¶¶ 139–140, 144.

- **Claim 7.** The Department offered evidence that every employee, not just Booker, was required to call Brinson if they planned to work more than eight hours. DSOF ¶ 43; R. 29-17, DSOF Exh. 17.

- **Claim 11**. The Department offered evidence that she did not receive another EEO counselor assignment because resources in the office were limited. DSOF ¶¶ 46–49; DSOF Exh. 9¶ 106.

Because the Department met its burden, the burden shifts back to Booker to rebut the Department's proffered legitimate reasons with enough evidence of pretext.

### 3. Pretext

Even when the evidence is viewed in Booker's favor, she fails to offer sufficient evidence to show that the Department's proffered reasons are in reality a pretext for discrimination. Pretextual reasons are *false* reasons, not merely reasons that are unfair to the employee. *Anderson v. Mott St.*, 104 F.4th 646, 653 (7th Cir. 2024). "[I]dentifying an inconsistency (or even a lie) is not necessarily sufficient to prove that the employer's rationale was pretext for discrimination." *Groves v. South Bend Cmty. Sch. Corp.*, 51 F.4th 766, 770 (7th Cir. 2022). Instead, Booker must provide evidence that would allow a reasonable jury to find that race was the basis for the adverse action. *See id.* (citing *Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 929 (7th Cir. 2020)).

Booker fails to do so. Rather than presenting evidence of pretext in her response brief or Rule 56.1 statements, Booker argues that she does not need to show pretext in the wake of *Ortiz*, 834 F.3d 760. *See* Pl.'s Resp. at 9–10. Booker is half-right but also half-wrong. Half-right: it is true that *Ortiz* holds that if the evidence evaluated as a whole (rather than artificially categorized as direct or circumstantial) would permit a reasonable factfinder to conclude that the employer discriminated, then the employee survives summary judgment. *Ortiz*, 834 F.3d at 765–66. But half-wrong: if Booker relies on the prima facie framework in this case, she indeed does need to offer evidence of pretext to create a jury issue—yet she disclaims the need to do so. So if

Booker is jettisoning reliance on the prima facie case, as she appears to do, then the overarching question remains under *Ortiz*: has Booker offered enough evidence, viewed as a whole, to allow a reasonable jury to infer discrimination in the face of the Department's explanations for how Kent Aldridge was treated? The answer is no, and Booker does not even attempt to confront the Department's explanations that no inference of discrimination can be drawn from the treatment of Aldridge. The race-discrimination claim does not survive summary judgment.

### B. Disability Discrimination

Booker also alleges that she was discriminated against based on her disability. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), prohibits federal agencies (like the Department) and recipients of federal funds from discriminating in its programs or activities based on disability. Section 504 of the Rehabilitation Act is "materially identical" to the Americans with Disabilities Act of 1990 (commonly referred to as the ADA), 42 U.S.C. §§ 12131–12134, and mirrors the employment discrimination standards established by the ADA. *See A.H. ex rel. Holzmueller v. Ill. High Sch. Ass'n*, 881 F.3d 587, 592 (7th Cir. 2018). In deciding the Department's motion for summary judgment, then, the pertinent tests are borrowed from the ADA.

To survive summary judgment, Booker must offer enough evidence "that, but for [her] disability, [s]he would have been able to access to the services or benefits desired." *H.P. ex rel. W.P. v. Naperville Cmty. Unit Sch. Dist. #203*, 910 F.3d 957, 960–61 (7th Cir. 2018) (cleaned up). To meet this burden, she may rely on any of the forms of disability discrimination: "(1) the defendant intentionally acted on the basis

of the disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionality impacts disabled people." *A.H.*, 881 F.3d at 593 (cleaned up).

Booker does little to separate the facts and evidence underlying the race- and disability-discrimination claims. Put simply, she argues that the adverse actions could be attributed to race or disability discrimination (or, presumably, both). Compl. ¶ 77; Pl.'s Resp. at 4–7. What that means, however, is that like the race-discrimination claim, she does not provide enough evidence that any action the Department took could reasonably be attributed to anything other than legitimate, non-discriminatory reasons. In other words, Booker does not offer sufficient evidence that "but for" her disability, she would have been treated differently. *See H.P.*, 910 F.3d at 960–61. Without more, then, Booker's disability-discrimination claim also cannot withstand summary judgment.

### C. Interference and Retaliation (Rehabilitation Act)

Booker next argues that several of the Department's actions interfered with her ability to access reasonable accommodations, and that the same actions establish a claim for retaliation based on her request for an accommodation. In her response brief, Booker argues that the Department waived summary judgment on both claims by failing to show that her travel assignment was caused by something other than a negative response to her accommodation request. Pl.'s Resp. at 1, 5 n.4. The Department did not waive summary judgment on either claim, R. 42, Minute Entry 7/7/23, but an issue of fact does exist on both claims.

18

Like disability-discrimination claims, claims for interference and retaliation under Section 504 of the Rehabilitation Act are also controlled by the standards of their ADA counterparts. *See Frakes v. Peoria Sch. Dist. No. 150*, 872 F.3d 545, 550 (7th Cir. 2017) (interference); *A.H.*, 881 F.3d at 592 (retaliation). Both claims arise out of the anti-retaliation provision entitled "Prohibition against retaliation and coercion," 42 U.S.C. § 12203. Section 12203(a) defines a claim for retaliation, making it unlawful for a person to "discriminate against any individual because such individual has … participated in any manner in a[] … proceeding … under this chapter." The next subpart, § 12203(b), defines a claim for interference. That provision makes it unlawful to "coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on the account of his or her having aided or encouraged any other individual in the exercise of any right granted or protected by [the ADA]." *Id.*

To defeat summary judgment on the interference claim, Booker must proffer evidence that: "(1) she engaged in activity statutorily protected by the ADA; (2) she was engaged in, or aided or encouraged others in, the exercise or enjoyment of ADA protected rights; (3) the defendants coerced, threatened, intimidated, or interfered on account of her protected activity; and (4) the defendants were motivated by an intent to discriminate." *Frakes*, 872 F.3d at 550–51. Similarly, to advance a retaliation claim under the Rehabilitation Act, Booker must provide evidence showing that "(1) she engaged in a statutorily protected [activity]; (2) she suffered an adverse action by her

employer; and (3) there is a causal link between her protected [activity] and the adverse action." *Fuller v. McDonough*, 84 F.4th 686, 690 (7th Cir. 2023).

The two claims are quite similar, with essentially overlapping elements. Important to both claims is the element of causation. Booker can satisfy the causation element if she can point to enough evidence—whether direct, circumstantial, or viewed as a whole—showing that the Department acted against her because she requested an accommodation. *See Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012); *Anderson v. Donahoe*, 699, F.3d 989, 996 (7th Cir. 2012). Circumstantial evidence may include evidence of suspicious timing between the protected activity and the adverse action. *Id.*

But there is a difference between interference and retaliation claims: an interference claim is, by its terms, broader than retaliation claims, because the interference provision protects employees who were subjected to adverse treatment that is not as severe as retaliation. *See Brown v. City of Tucson*, 336 F.3d 1181, 1192 (9th Cir. 2003) (explaining that "the ADA's interference provision … protects a broader class of persons against clearly defined wrongs" than the anti-retaliation provision does). Having said that, in this case, the parties can rely on the same facts and evidence to support either claim. Because the Department adequately presented evidence supporting its opposition to Booker interference and retaliation claims, its arguments are preserved, R. 42, and it is time to turn to the contentions.

The facts that underlie Booker's interference and retaliation claims were labelled as Claims 1 and 2 by the parties. The parties agree that Booker engaged in a

protected activity when she requested a reasonable accommodation. The parties mostly dispute whether the Department's conduct interfered with Booker's right to access her reasonable accommodation—that is, to telework on Tuesdays and Thursday so that she could attend physical therapy appointments—and if it did so, whether the Department acted with a discriminatory intent.

Booker centers her argument on Brinson assigning Booker in-person audits at other remote locations just one week after she requested the accommodation. Pl.'s Resp. at 6–7. Brinson contends that the audits had to be conducted in person to ensure that the files were stored in hard copy. Def.'s Resp. PSOF ¶ 19; DSOF Exh. 8 ¶¶ 336–37. Brinson set a tight deadline—without further explanation—that she "hoped" to get the trips done before September 30, 2019, which was the end of the fiscal year. DSOF ¶ 29; R. 29-11, DSOF Exh. 11. Then, in a follow up email on August 13, Brison added that she would like Booker to work with Patrice Davis—another experienced records-management employee in the Office—to schedule the site visits. *Id.* But Davis's limited availability further restricted Booker's travel schedule by a few weeks so that Booker and Davis had to complete the audits "by no later than the week of September 16." DSOF ¶ 30; R. 29-12, DSOF Exh. 12.

Booker also offers evidence that on August 12, she verbally told Brinson that travelling to the remote offices would be difficult because of her therapy and medical appointments and because she would have to find care for her son. DSOF ¶ 33; DSOF Exh. 10 at 18 (PDF page number). Even more, Booker explains that the records audits could have been performed remotely, PSOF ¶ 19; Booker Decl. ¶ 23—a point on which

21

she has personal knowledge given her work experience. And, at the least, Brinson was aware of Booker's accommodation request when Brinson asked Booker to travel to the remote offices and conduct the in-person audits. PSOF ¶¶ 15–17; DSOF Exh. 4; R.29-6, DSOF Exh. 6; Booker Decl.¶¶ 18–20.

In response, Brinson testified that Booker supposedly did not tell Brinson that travel for the audits would interfere with her doctor's appointments. Pl.'s Resp. DSOF ¶ 33; DSOF Exh. 7 ¶¶ 33, 46, 55–56. Brinson further explains that Booker proposed a travel itinerary on her own, that she traveled to each of the eight district offices and conducted the reviews, and that Booker never told Brinson that the travel would be a hardship for her. DSOF ¶¶ 31–33; R. 29-14, DSOF Exh. 14. And finally, despite Brinson's instruction that Booker conduct in-person audits, Brinson granted Booker's reasonable accommodation on August 20 and documented Booker's satisfaction with it. DSOF ¶ 27; DSOF Exh. 7 ¶¶ 323, 327, 331.

On balance, when viewed in the light most favorable to Booker, the evidence is sufficient to raise a genuine issue on whether the travel assignment interfered with Booker's accommodation and was intended to retaliate against her for requesting additional telework. First, Booker offered enough evidence of the Department's knowledge that she requested remote work twice per week to attend physical therapy appointments. DSOF Exh. 4; *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 124 (7th Cir. 2021) (explaining that a plaintiff can demonstrate causation in a Title VII case by showing that the "decisionmaker was aware of the protected activity at the time the alleged retaliation occurred").

Second, the timing of the travel assignment also suggests (or at least a reasonable jury could so find) that Brinson intentionally tried to prevent Booker from accessing the accommodation. *See Anderson*, 699 F.3d at 996. Before this request, the Department had not asked any other employee to travel to conduct in-person records audits at remote locations. And, tellingly, the Department did not offer evidence of an employee being asked to do so since. *See* PSOF ¶ 35, 36; Booker Decl. ¶¶ 59, 62; Def.'s Resp PSOF ¶ 19. Even though Booker could set the specific logistics of her travel schedule, she was assigned a tight, time-crunched period in which to accomplish the audits. And the Department has offered no evidence to rebut Booker's assertion (based on her personal knowledge) that she could not set the travel schedule in a way to avoid all conflicts with her physical therapy. Based on this evidence and viewing it in the light most favorable to Booker, a reasonable juror could find that Booker's accommodation request was a "substantial or motivating factor" behind the Department's decision to give her the travel assignment. *See Taylor-Novotny v. Health All. Med. Plans, Inc.*, 772 F.3d 478, 495 (7th Cir. 2014) (cleaned up).

Booker lodges one more retaliation claim arising from assisting her colleagues with EEO complaints against Navarro. Pl.'s Resp. at 6. On this aspect of the claim, however, Booker fails to offer evidence of any adverse action inflicted by Navarro, so this retaliation claim does not withstand summary judgment. Booker contends that after Booker assisted her colleagues file EEO complaints against Navarro, "Brinson sent Booker an email claiming that Booker had performance issues." *Id.* But Booker makes no connection between the EEO complaints against Navarro and this email

from Brinson. Without more, this part of the retaliation claim does not survive summary judgment.

## IV. Conclusion

The Department's motion for summary judgment is granted in part and denied in part. Booker created a triable issue of fact on whether the Department interfered with her rights under the Rehabilitation Act and retaliated against her for exercising those rights by assigning her the in-person audits in September 2019. The parties shall engage in settlement negotiations and confer on the next step in the case, and then file a status report by October 23, 2024.

ENTERED:


    s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 26, 2024

24